IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CASE NO. 5:24-CR-393-M-RN

| UNITED STATES OF AMERICA | |
|---|---|
| v. | **SENTENCING MEMORANDUM** |
| DAVID RYAN WINTERS | |

This Court must decide two questions at sentencing: did the defendant intentionally select his victims because of their sexual orientation, and what sentence is sufficient but not greater than necessary? The evidence that the defendant selected the victims in this case because they are gay is overwhelming, though unusual: the defendant, himself a gay may, concluded that the gay community rejected him and targeted even strangers for harassment. Nonetheless, it is sufficient.

As for the defendant's sentence, the defendant likely will argue that supervision and mental-health treatment are the better solutions. But those solutions have repeatedly failed. Only a prison sentence will send the necessary signal to stop, now, no matter what and recognize the sheer terror his decade-long harassment campaign inflicted on so many people.

**FACTUAL AND PROCEDURAL SUMMARY**

The Presentence Investigation Report (PSR) describes the defendant's decade-long campaign to harass gay men in greater detail. (PSR ¶¶ 7-32). In short, beginning in 2013 or 2014, the defendant volunteered at the LGBT Raleigh Center. Around March 2016, after his behavior bothered other volunteers, the Center told him that

1

he was welcome to visit but could no longer volunteer. Outraged, the defendant began targeting Center leadership, including J.M.M. (Count 1), J.E.B. (uncharged), and K.T.[1] (uncharged) with vicious harassment and threats, including invoking the Pulse shooting. (Ex. 1). The Center had to take security measures. J.E.B. was so disturbed that he moved to the West Coast.

The defendant also attended ReachOut events in 2015 or 2016. ReachOut is a nonprofit that organizes local LGBT people to perform community service, and no evidence indicates that ReachOut rejected him. Yet the defendant began stalking people he met there too, including its director, J.M.W. (Count 2); B.B. (Count 3); J.L-M. (Count 4); A.C. (uncharged); and R.F. (uncharged).

His conduct and words were terrifying. He showed up at J.M.W.'s apartment building and sent pictures from the locked interior. He left A.C. a voicemail threatening to kill A.C.'s boyfriend and J.M.W. He sent B.B. a picture of B.B.'s home and repeatedly discussed his hatred of B.B., B.B.'s friends, and gay men. (Ex. 3). He threatened to lynch R.F., who is Black, and repeatedly called him a racial slur. (Ex. 7).

The defendant stalked other gay men he barely knew—or had never met. P.J. (Count Five) did not know the defendant at all before the defendant began messaging him and referring to disturbing, highly personal details, including about P.J.'s mother's death. (Ex. 4). M.L. had never met the defendant before he showed up at M.L.'s home, banging on the door. B.W. too did not know the defendant before he

---

[1] K.T. is a lesbian woman.

2

began getting messages criticizing B.W. and complaining that the gay community did not accept the defendant.

N.G. was friendly with the defendant until he declined the defendant's offered ride from the airport—and the defendant's behavior escalated. N.G., a professor, ended up needing campus security to protect him. D.M. did not know the defendant personally but had been warned by J.M.M. that the defendant was unstable. D.M. blocked the defendant after the defendant "liked" his post, and the defendant became enraged, calling D.M. racial slurs in repeated emails. (Ex. 8). D.M., who also worked at a university, had to get campus police involved too.

The defendant has a long history of psychological and psychiatric treatment. But he has often turned on his treatment providers for perceived slights. In February 2020, when his then-psychiatrist, M.C., did not respond immediately to the defendant's texts, the defendant became enraged, sending M.C. escalating threats to kill M.C., M.C.'s friends (including B.B., Count 3), and gay men. M.C. obtained a restraining order. The defendant responded by showing up to M.C.'s office, smashing the window in his office door, and throwing a metal trash can on M.C.'s car, shattering the rear window. (Ex. 5 at 8-14).

The defendant began seeing E.B. (uncharged), a trauma therapist, in summer 2024. After taking offense at something E.B. wrote in an email, the defendant sent escalating, malicious emails that referred to E.B.'s husband and discussed the defendant's hatred of gay men and J.L-M. (Count 4). (Ex. 6). That was not new; in 2017, he emailed a female therapist, "I hope you're business becomes ruined. . . . I

3

hope something bad happens to your kids." She asked him to stop contacting her.[2] (Ex. 9).

The defendant stalked and harassed victims for nearly a decade, all while he was receiving frequent psychological and psychiatric treatment, including talk therapy, medication, and occasional hospitalization. (PSR ¶ 52). The stalking continued.

He also attracted increasing attention from the criminal justice system. In 2018, charges stemming from him stalking and threatening R.F. were dismissed. (PSR ¶ 46).In November 2019, he was convicted of cyberstalking, communicating threats, and stalking and sentenced to probation. (PSR ¶¶ 34-35). While still on probation, he was convicted of injury to personal property, injury to real property, and stalking for his attack on M.C. (PSR ¶ 36). He was again sentenced to probation, which he violated by contacting M.C. on social media. (PSR ¶ 36). In February 2024, he pleaded guilty to cyberstalking J-L.M. and was sentenced again to probation. (PSR ¶ 37). He was still on probation when he was arrested in this case in November 2024. Computer records showed he had searched for many of the victims in this case online as recently as the day before his arrest.

## ARGUMENT

This Court should find that the hate-crimes enhancement, USSG § 3A1.1(a), applies because the defendant deliberately selected at least some victims charged in this indictment because they were gay. And it should impose a significant prison

---

[2] That therapist does not appear to be LGBTQ; the reason the defendant became upset is unknown.

sentence to protect the community from a relentless stalker who refuses to comply with treatment or supervision.

> A.  *The Defendant Targeted the Victims Because They Were Gay.*

If this Court "determines beyond a reasonable doubt that the defendant intentionally selected any victim . . . as the object of the offense of conviction because of the actual or perceived . . . sexual orientation of any person," a three-level enhancement applies. USSG §3A1.1(a). Courts apply the enhancement when the evidence shows the defendant was targeting victims based on a protected status. *See United States v. Sherifi*, 107 F.4th 309, 319 (4th Cir. 2024) (citing *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 154 (2d Cir. 2008)).

Little case law exists interpreting this provision. *Burrage v. United States* explained, however, that "because of" means but-for causation. 571 U.S. 204, 212 (2014). A but-for cause is not necessarily the *only* cause; other links or factors can influence a result. *Id.* at 211-12. But the act must be one necessary link in the causal chain. That reduces this case to a simple question: but for the charged victims' sexual orientation, would the defendant have stalked and threatened them?

The answer is no. The defendant's harassment began when the LGBT Raleigh Center asked him to stop volunteering. The defendant retaliated with a decade-long harassment campaign directed at people associated with the Center—and beyond. Many victims in this case, including J.M.W. (Count Two), B.B. (Count Three), and J.L-M. (Count Four) met the defendant through ReachOut—a different organization whose only offense appears to have been its association with gay men.

5

Some victims had absolutely no connection to the defendant other than being gay. P.J. (Count Five), M.L. (uncharged), and B.W. (uncharged) had never met the defendant until he began stalking them. Yet he told P.J., "You strike me as a wildly out of touch gay male who has no clue how good you have it. You are judgmental as hell." (Ex. 4). He had no basis to conclude that other than his own biased stereotypes about gay men.

The defendant said, repeatedly, that he was targeting gay men because he hated them. He explained to B.B., "My emails were a form of fighting back after being rejected by gay men for being unemployed and living at home. It all began with board members of ReachOut." (Ex. 3 at 6). "You all look down on me, which hurts and pisses me off, then I send the messages." (Ex. 3 at 1). He added, "[J.M.M.] is the biggest asshole." (Ex. 3 at 1). The defendant repeatedly justified his behavior to B.B. by explaining, repeatedly, that "gay men rejected me." (Ex. 3 at 1-3). "I seriously still very angry with all the rejections I've received from gay men. I'm often very angry with [M.C.]." (Ex. 3 at 5).

He likewise told J.M.W. that because gay men rejected him, he had "demented, evil thoughts about hurting other people." (Ex. 2). The defendant also told J.M.W. that he knew where B.B. (Count Three) lives, adding, "I have no remorse! And take grade pride in coming after sick ass gay men!" (Ex. 2). His intentions were often terrifying. He told J.M.M. that he wished he had died in the Pulse nightclub shooting with "Blood gushing down all over your face and body!" (Ex. 1). He told J.M.W., "All gay men should have their dicks cut off!" (Ex. 2). He wrote to M.C.'s brother, in a rant

6

discussing many of the victims in this case, "I don't have a problem with straight white men. Just white cis gay men." (Ex. 5 at 5).

The night he blew up at M.C., he threatened to kill B.B. and continued, "I'd try to kill you and then torch your office!" He added, "Fuck all gay men for what they have done to the mentally ill. Make national headlines!!!!! Gun down as many as possible! Thousands! Millions!!!!!" (Ex. 5 at 3). When he became angry at another therapist, E.B., he similarly wrote, "I hate gay men and how they have rejected me and make me feel. It takes me years to get over things. I can spiral out of control. I demonically hate [J.L-M.] and his friends!!!!!!!!!" (Ex. 6 at 3).

The defendant likely will respond that he, a gay man himself, simply resented his social exclusion and romantic rejection; he did not hate the victims' sexuality. That argument misunderstands the purpose of the enhancement. It "applies if the defendant 'intentionally selected any victim on the basis of one of the factors listed . . ., and because there can be no 'good reasons' for doing so, the underlying motivation is simply beside the point." *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d at 154 (refusing to distinguish political from racial or religious targeting).

The fact the defendant stereotyped gay men as socially or romantically hostile rather than some other offensive label does not change the wrongfulness of what he did: essentialize an entire class of people based on their sexuality. It is the same logic as someone who refuses to hire Black women because a Black woman fired him in a previous job. People deserve to be treated as individuals; the defendant treated these victims categorically as his enemies.

And sexuality need only be *one* but-for cause in the chain. *Burrage*, 571 U.S. at 211-12. Human motivation is complex and defies neat explanations. Without question, many factors shaped the defendant's behavior, including his social difficulty, mental-health challenges, and probably other issues too. But he very specifically, and very explicitly, targeted gay men for his harassment. And he did not target one or two former romantic partners; he targeted at least fifteen gay men (and one gay woman), most of whom had no involvement in dismissing him as a LGBT Raleigh Center volunteer and some of whom had literally never met him.

The fact the defendant is gay does not change that calculus. Nothing in the guideline text excepts members of the same class. It is possible for people of the same racial, religious, or sexual group to target their own out of misplaced hatred or resentment, and the law should protect those victims as much as victims whose attacker is from a different group. And the defendant's outrageous messages to R.F. (Ex. 7) and D.M. (Ex. 8) indicate that he is no stranger to animus toward other groups, especially Black people.

The defendant selected at least one victim—if not all of them—because the victim was gay. The three-level enhancement therefore applies.

B.   *This Court Should Impose a Significant Prison Sentence.*

This Court is familiar with the 18 U.S.C. § 3553(a) sentencing factors. They include the defendant's history and characteristics; the nature and circumstances of the offense; the need to reflect the seriousness of the offense, promote respect for the

law, and provide just punishment for the offense; deterrence; and the need to protect the public from the defendant's future crimes; and providing needed treatment. *Id.*

The government anticipates the defendant will request probation so that he can undergo mental-health treatment. Nobody disagrees that this defendant suffers from serious mental-health conditions and needs treatment. This Court should impose a substantial prison sentence, however, for two reasons.

First, treatment has not curbed the defendant's behavior. All evidence indicates that the defendant has not wanted for medical treatment or other support. His upper-middle-class family began addressing his mental-health issues in childhood. During adulthood, the defendant has had years of therapy, been prescribed medication, and even been hospitalized.

The problem is that he is not compliant with treatment. He refuses to take medication because he thinks it makes him gain weight and because he makes money through participating in clinical trials that bar outside medications. He has threatened at least three therapists, M.C. (Ex. 5), E.B. (Ex. 6), and a female therapist (Ex. 9) to the point where they had to fire him and block communication. When M.C. obtained a restraining order, the defendant retaliated and attacked his office and vehicle. (Ex. 5). The defendant might argue that federal supervision could ensure compliance—but he has been on probation for much of the last several years to no effect.

This defendant has experienced lots of kindness. Many people—his parents and even some victims in this case—have tried hard to offer him medical, social, and

9

Case 5:24-cr-00343-M-RN    Document 34    Filed 02/16/26    Page 9 of 12

financial help. Prosecutors have dismissed charges, pleaded felonies to misdemeanors, and let him stay on probation. He has taken that forgiveness as an invitation to keep going. This defendant has serious mental-health issues, certainly, but he is a competent adult able to exert self-control. This Court should try the one solution remaining: a period of incarceration where he can be required to comply with treatment and prevented from stalking other people.

This Court will hear, at the sentencing hearing, more about the significant trauma this defendant's actions have caused to these victims and the broader LGBTQ community in Raleigh-Durham. But when this Court considers the need for just punishment, to promote respect for the law, and to protect the public, this Court should consider the message a too-lenient sentence will send to those the defendant has injured. These victims were simply trying to live their lives, improve their communities, and make life more welcoming for LGBTQ people. And the defendant terrorized them for it.

## **CONCLUSION**

This Court should apply the three-level hate-crimes enhancement, USSG § 3A1.1(a), and impose a significant prison sentence on this defendant.

Respectfully submitted this 16th day of February, 2026.

        W. ELLIS BOYLE
        United States Attorney

        <u>/s/ ERIN C. BLONDEL</u>
        ERIN C. BLONDEL
        Assistant United States Attorney
        Criminal Division
        U.S. Attorney's Office, EDNC
        150 Fayetteville Street, Suite 2100
        Raleigh, North Carolina 27601
        erin.blondel@usdoj.gov
        Telephone: 919-856-4458
        Fax: 919-856-4487
        NC Bar No. 46977

## CERTIFICATE OF SERVICE

This certifies that a copy of this memorandum has, this 16th day of February, 2026, been served upon the defendant by CM/ECF as follows:

Lauren Harrell Brennan
Assistant Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, NC 27601

/s/ ERIN C. BLONDEL
ERIN C. BLONDEL
Assistant United States Attorney
Criminal Division
U.S. Attorney's Office, EDNC
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
erin.blondel@usdoj.gov
Telephone: 919-856-4458
Fax: 919-856-4487
NC Bar No. 46977